UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BRYAN KOPESKY,

        Plaintiff,

    v.                                  Case No. 21-C-59

AETNA LIFE INSURANCE COMPANY,

        Defendant.

## DECISION AND ORDER OF DISMISSAL

Plaintiff Brian Kopesky commenced this action against Defendant Aetna Life Insurance Company, alleging Aetna violated the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, by denying his long-term disability (LTD) benefits. The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331. This matter comes before the Court on Kopesky's motion for summary judgment. Having reviewed the administrative record, the Court concludes that Aetna's denial of benefits was not arbitrary and capricious. Kopesky's motion for summary judgment is therefore denied and the case dismissed.

## BACKGROUND

Kopesky began working for Kimberly Clark Corporation in 1982 and last worked as the Director of the North American SAP Integration Office. AR 3118. Kopesky became a participant in Kimberly Clark's employee welfare benefits plan, which included disability benefits under Group Policy No. GP-657208-B (the Plan). Benefits are paid under the Plan only when Aetna certifies a period of disability. AR 2564. "A period of disability will be certified by Aetna if, and only for as long as, Aetna determines that you are disabled and the Disability occurs as a direct

result of a significant change in your physical or mental condition occurring while you are covered under this Plan." AR 2554. "Disability" is defined under the Plan as:

> Your inability, solely due to **Disease** or **Injury**, to perform for wage or profit the material duties of your own occupation. After the Waiting Period and the first 24 months of your inability to perform for wage or profit the material duties of your own occupation, your inability, solely due to **Disease** or **Injury** to work at any **Reasonable Occupation**.

AR 2578 (emphasis in original). "Disease" is defined as "[a]n abnormal condition of an organ or a body part that impairs normal physiological functioning," and "injury" is defined as "an accidental bodily injury." AR 2578–79. A "reasonable occupation" is "any gainful activity for which you are, or may reasonably become, fitted by education, training, or experience." AR 2581. The Plan provides for partial disability when Aetna determines that "[d]ue to the same **Disease** or **Injury** that caused the **Disability**, you are not able to perform, for wage or profit, the material duties of your own occupation on a full-time basis and you are working for wage or profit . . . at another occupation." AR 2579.

On February 9, 2004, Kopesky was struck by a motor vehicle from behind when he was walking on the shoulder of a highway to assist another driver that had driven into a ditch. AR 3449. Kopesky was treated in the emergency room, where he denied any loss of consciousness. AR 3247. His exam was normal except for an ear laceration and superficial skin abrasions. *Id.* Kopesky received stitches in his ear and was discharged the same day. AR 3248. After the automobile accident, Kopesky was treated for a cerebral cortex contusion/traumatic brain injury (TBI) causing post-concussive syndrome and fatigue. AR 1305–22.

On April 9, 2004, Kopesky submitted a disability claim to Aetna. He claimed that he sustained a severe blow to the left side of his head and a severe concussion and was unable to think clearly as a result. AR 3449. Aetna approved his claim under the Plan's "own occupation"

definition of disability on September 30, 2004. AR 3019–22. Aetna's approval letter noted that, to obtain benefits as of September 24, 2006, Kopesky would need to satisfy the "any reasonable occupation" definition of disability by providing "objective medical evidence that you are unable to perform any reasonable occupation." AR 3019.

On February 21, 2018, Aetna no longer approved Kopesky's LTD claim because it determined, after reviewing the medical documentation in the claim file, that Kopesky no longer met the Plan's reasonable occupation definition of disability. AR 2510–17. The denial letter summarized Kopesky's statements, his work history since 2006, his medical documentation, and the vocational rehabilitation consultant's review. Aetna noted Kopesky claimed that he could not perform full-time work activity because of residual brain injury symptoms attributable to the 2004 accident, that he took daily mid-day naps of two to three hours, and that, if he did not take a nap, he was unable to maintain what he perceived to be his "optimal cognitive function." AR 2512.

As to Kopesky's work history, Kopesky started B. David Construction LLC on September 26, 2005. Kopesky indicated during a June 22, 2017 telephone claimant interview that he used to do remodeling "for physical and mental exercise" but stopped doing so in 2015 to focus on Torchgrip/TecDriven, a tablet accessory company. AR 1471–72, 2512. Aetna observed that Kopesky was the co-partner of Torchgrip/TecDriven, an active limited liability company that was filed in Wisconsin on October 12, 2010. AR 2512. During a February 9, 2017 telephone claimant interview, Kopesky indicated that he launched the Torchgrip/TecDriven product in December 2015, but the rollout was hampered by quality issues. He explained that the company pulled the product from sale and retooled it. Although Kopesky put the revised product up for sale again, Kopesky noted that 2016 was a slow year concerning sales. An Aetna representative spoke with Kopesky's Torchgrip/TecDriven co-partner James Pollex. On September 29, 2017, Pollex stated

3

that Kopesky makes his own schedule and works part-time and that they meet every Tuesday morning at Innovationedge. Aetna noted that although Pollex explained that Kopesky does not meet with or deal with clients or potential clients, he did not explain that there was any reason Kopesky could not do so. *Id.*

Aetna also observed that Kopesky was the "Founder, Director, Chairman" of Mighty Hearts International. Kopesky founded Mighty Hearts in 2008 to make a difference in the lives of the children of Peru. *Id.* During the February 9, 2017 claimant interview, Kopesky indicated that he meets with two other members of Mighty Hearts monthly and spends five hours per month on work for Mighty Hearts, which involves recording donations and attending meetings. Kopesky stated during the June 22, 2017 claimant interview that he may travel to Peru with Mighty Hearts in 2018. *Id.*

With respect to Kopesky's treatment history, Aetna explained that due to the "large amount" of medical records obtained since the onset of Kopesky's LTD claim in 2004, it would not discuss every examination in the letter. AR 2513. It advised that it reviewed all of the medical documentation in the claim file to understand Kopesky's medical history and functional and work capacities and that the focus of its review concerned Kopesky's current functional status. Aetna obtained updated medical records from Kopesky's treating physicians, Dr. Ryan Zantow, Dr. Scott Powley, Dr. Scott Gyorog, and Dr. Thomas Mattio, and summarized their findings. It also cited the neuropsychological evaluations conducted on May 14, 2012, and April 27, 2015, as well as the neuropsychological evaluation performed by Dr. Terence Young on December 18, 2017. Aetna explained that its neuropsychologist concluded that Kopesky's current function is intact and that there are no findings evidenced in Kopesky's test results or Dr. Young's observations that support that Kopesky has any cognitive or emotional impairment that would impede his ability to perform

4

fulltime work activity. It indicated that it did not find Kopesky's assertions of impairment persuasive in terms of supporting that he is precluded from performing full-time sedentary work activities.

Aetna also noted that Vocational Rehabilitation Consultant Joseph Thompson completed a transferrable skills assessment (TSA) and identified the following occupational alternatives as suitable for Kopesky: director, with a mean average wage of $60.19 per hour; owner, with a mean average wage of $96.00 per hour; and president, with a mean average wage of $75.06 per hour. Aetna agreed with the vocational consultant's conclusions and found the identified occupations as reasonable given Kopesky's education, training, and experience.

Aetna concluded that Kopesky no longer met the Kimberly-Clark Corporation group LTD policy's reasonable occupation definition of disability. It stated that the LTD claim would be paid through February 21, 2018, and then closed.

Kopesky appealed Aetna's decision on October 24, 2018. AR 2003–18. He submitted additional documentation to support his claim, including a report from his physical medical and rehabilitation physician, Benjamin R. Siebert, MD, FAAPMR; occupational, physical, and speech therapy treatment notes from August to October 2018; a Vocational Expert Report from Sarah Holmes, MS, CRC, LPC; eight medical journal articles documenting studies confirming the prevalence of post-TBI fatigue; and six family and acquaintance letters describing firsthand accounts of Kopesky's ongoing fatigue and the limitations on his daily life.

On February 8, 2019, Aetna upheld its decision to terminate LTD benefits. The letter indicated that Aetna reviewed all of the information Kopesky and his doctors submitted for consideration. On October 30, 2018, Aetna referred the claim for independent clinical review by a board-certified physician specializing in neurology with added expertise and board certification

in brain injury medicine as well as added expertise and board certification in pain medicine. Aetna noted that the findings of the independent clinical review failed to support functional impairment of a severity that would have prevented Kopesky from working in any occupation for an eight-hour workday/40-hour workweek. While Aetna acknowledged that the evidence supported that Kopesky suffered a traumatic brain injury, reportedly in 2004, there was a lack of clinical evidence to support functional impairment that would have prevented Kopesky from performing any occupation effective February 22, 2018.

Aetna also requested peer-to-peer telephone consultation with Dr. Scott Gyorog, Dr. Scott Powley, and Dr. Benjamin Siebert. When the reviewer was unable to speak with these doctors, the reviewer sent a copy of the report and specific questions to the doctors on November 19, 2018, but received no response from any of the doctors.

Aetna observed that Kopesky referenced impairment due to sleep related disorder and that there was evidence of complaints of impairment related to sleep issues. But the most recent sleep study provided for consideration was performed in September 2007 and the most recent clinical note, outside of the December 17, 2017 neuropsychological evaluation, was dated June 6, 2017, by Dr. Gyorog, when Kopesky was seen for a general follow up. Aetna indicated that an independent review by a board-certified physician specializing in sleep medicine revealed a lack of clinical evidence to support functional impairment that would have required restrictions and/or limitations or prevented Kopesky from sustaining activity for an eight-hour period as of February 22, 2018. It explained that, although Kopesky suffered a head injury, the severity remained in question because multiple reports conflicted as to whether Kopesky lost consciousness. Aetna concluded there was no documentation validating Kopesky's primary complaint of excessive daytime somnolence.

Aetna noted that, while problems with sleep/wake schedule and problems with hypersomnolence can follow a severe head injury, there is a lack of clinical documentation to support it. It found that the September 9, 2007 daytime multiple sleep latency test was not valid because Kopesky did not undergo a nighttime sleep study with a normal amount of sleep the evening before the daytime test. The need for daily naps, the number of naps and/or length of naps reported was not supported by clinical evidence because the only documentation of true excessive daytime somnolence was the invalid September 2007 sleep latency test. Aetna noted that no recent multiple sleep latency test was provided for consideration and that there was no updated clinical documentation from a neurologist or from a sleep medicine specialist.

To support its determination, Aetna relied on a December 18, 2017 neuropsychological evaluation, which revealed an essentially normal neuropsychological profile and no indications of emotional or behavior instability. Aetna stated that, while Kopesky reported being tired, there was no notable behavior suggesting non-normative somnolence or drowsiness observed. During the examination, Kopesky declined offered breaks, did not take a lunch break, and only took three breaks lasting five to ten minutes at the direction of the examiner. Aetna indicated that there were no cognitive or psychological limitations that would have prevented Kopesky from working at any occupation on a fulltime basis with routine breaks and a meal break during the day.

Aetna explained that there were references to anxiety and depression, but there was no documentation to support that Kopesky was referred to or was under the care of a recognized mental health professional, as would be expected if there were mental health diagnoses and/or symptoms of a severity that would have prevented Kopesky from sustaining functional activity. Kopesky confirmed in 2017 that he was not under the care of a recognized mental health professional. Aetna concluded that there is no information on file to support functional

impairments from a behavioral/mental health perspective that would have prevented Kopesky from working at any reasonable occupation effective February 22, 2018.

Aetna further noted that the reports that Kopesky is unable to maintain businesses, attend monthly/weekly meetings, and travel to Peru were inconsistent with the clinical evidence. It indicated that Kopesky demonstrated the capacity to work at a sedentary physical demand level (PDL) occupation while obtaining LTD benefits at B. David Construction, Mighty Hearts, and Torchgrip/TecDriven LLC. Aetna stated that, while Kopesky described his self-employment as a contractor/remodeler as a hobby and performed work for friends and family instead of for profit, the physical demand level of such work would be more demanding than a sedentary PDL occupation. It also observed that the ability to start/partner a business venture such as Torchgrip/TecDriven would support that Kopesky maintained at least sedentary functional capacity and that the work-related and charity-related activities involve similar functional requirements, cognitive capacity, and material duties as that of Kopesky's own prior occupation as "Project Director."

Aetna also cited the TAS and noted that Kopesky has a Bachelor's Degree in Mechanical Engineering. Aetna found that Kopesky's transferrable skills include computer usage-management, engineering, administration, computer skills, customer service, communication, directing others, recordkeeping, data analysis, and business management. It identified director, owner, and president as reasonable occupations and "90th percentile" wages as the appropriate wage based on Kopesky's prior education and experience. Aetna stated that while Kopesky was approved for social security disability benefits in 2012, the standards governing receipt of public and private benefits are different.

For these reasons, Aetna concluded that the termination of Kopesky's claim for benefits was appropriate. With the Plan's administrative remedies exhausted, Kopesky filed this action for judicial review.

## LEGAL STANDARD

"A denial of benefits normally is reviewed de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "In such a case, the denial of benefits is reviewed under an 'arbitrary and capricious' standard." *Id.* (quoting *Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007) (footnote omitted)). In this case, the parties agree that the Plan vests Aetna with discretionary authority and that the arbitrary and capricious standard applies.

"Under the arbitrary and capricious standard, the reviewing court must ensure only that a plan administrator's decision 'has rational support in the record.'" *Id.* (quoting *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006)). "Put simply, an administrator's decision will not be overturned unless it is 'downright unreasonable.'" *Id.* (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006)). "However, '[r]eview under the deferential arbitrary and capricious standard is not a rubber stamp and deference need not be abject.'" *Id.* (quoting *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003)). "Nevertheless, we will uphold the plan's decision 'as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'"

9

*Id.* (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (internal quotation marks omitted)). "The court must also be mindful of the conflict of interest that can exist when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Des Armo v. Kohler Co. Pension Plan*, No. 13-C-436, 2014 WL 3860049, at *5 (E.D. Wis. Aug. 6, 2014) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)). The Court must "consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits," and the conflict of interest is "weighed as a factor in determining whether there is an abuse of discretion." *Glenn*, 544 U.S. at 108.

## ANALYSIS

Kopesky asserts that Aetna acted arbitrarily and capriciously by "moving the target" required for approval of his LTD claim. He contends that Aetna's sudden insistence on relying on clinical evidence alone as proof of disability under the Plan was inconsistent with the nature of his TBI diagnosis and medical history as well as Aetna's longstanding interpretation of what constituted sufficient proof of disability. Kopesky also asserts that Aetna suddenly considered his limited post-disability work and charitable endeavors as evidence of employability in a reasonable occupation, even though Aetna had not previously found that those activities equated to a "reasonable occupation" under the Plan.

Although previous payment of benefits is one factor a court may consider in determining whether a plan administrator's decision was arbitrary and capricious, a plan's previous payment of benefits does not operate "forever as an estoppel" so that an administrator can never determine that a claimant is no longer disabled as defined by the plan. *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832 (7th Cir. 2009) (internal quotation marks and citation

10

omitted).  Aetna, as the plan administrator, "is entitled to seek and consider new information and, in appropriate cases, to change its mind."  *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 767 (7th Cir. 2010).

As to the clinical evidence, Kopesky maintains that Aetna "pivoted from its full consideration of Plaintiff Kopesky's medical history and clinical picture in light of Dr. Young's December 2017 neuropsychological testing results."  Dkt. No. 37 at 20.  Dr. Young completed neuropsychological testing on December 18, 2017.  AR 1759–72.  The examination consisted of 7.5 hours of continuous testing with only three five-minute breaks and no lunch break.  Dr. Young found that, based on his direct clinical observations and from a "neuropsychological/psychological perspective, there were no indications for emotional or behavioral instability."  AR 1770.  He explained that, over the course of the lengthy examination, Kopesky's mood, behaviors, and interpersonal manner were stable; he was pleasant and engaging; and there were no signs of organic apathy/indifference, amotivation, lability, or disinhibition observed.  Dr. Young noted that, while there were instances in which Kopesky described feeling tired with associated predictions for a decline in performance, at no point was there notable behaviors suggestive of non-normative somnolence or drowsiness observed and there was no appreciable negative influence on neuropsychological performance level or functional abilities.  Dr. Young indicated that, "at these times, Mr. Kopesky would decline the need for a break and was also able to engage in factual/detailed conversations with excellent facility."  *Id.*  Dr. Young observed:

> [T]he evaluation revealed an essentially normal neuropsychological profile with normal attention, working memory, processing speed, complex information processing, executive functioning, most aspects of learning and memory, speech and language, and perceptual reasoning and integration.  There were indications for moderate impairment of short term verbal memory with intact delayed free recall reflecting integrity of underlying axial memory structures.  Additionally, the finding of short term verbal memory deficit is below what was found on previous neuropsychological evaluations and would unlikely be the result of the index

11

incident given concussion/TBI is not a progressive condition and decline in functioning, especially thirteen years post-incident, would be more likely than not be [sic] related to some other cause. . . . [B]ased on the administration of various domain measures dispersed over the course of the lengthy examination, there was no indication fatigue was a significant delimiting factor in neuropsychological functioning. Consideration for the potential negative influence of long-term benzodiazepine use on subjective sense of daytime sleepiness was suggested.

AR 1770–71. He concluded that "from a neuropsychological/psychological perspective, there are no indications for neuropsychological/psychological limitations that would interfere with Mr. Kopesky's ability to perform any occupation for any employer." AR 1771. Aetna argues that Dr. Young's IME objectively evidenced that Kopesky's cognitive functions were normal and unaffected by subjective fatigue.

Kopesky asserts that since 2006 neuropsychological testing has repeatedly showed that he was high-functioning with above-average intellect and that multiple doctors and medical journals repeatedly stated that such testing does not sufficiently capture the true functional ability of someone suffering from post-TBI fatigue. He maintains that Aetna's failure to consider Kopesky's complete medical history and clinical picture in light of Dr. Young's neuropsychological testing was arbitrary and capricious. In its initial denial letter, however, Aetna noted that the focus of its review concerned Kopesky's current functional status. Not only did Aetna rely on Dr. Young's findings; it also relied on the opinions of two independent reviewing physicians, Dr. David Hoenig and Dr. James Pearce. Dr. Hoenig concluded that, based on the documentation provided and from a neurological perspective only, there is a lack of clinical evidence that Kopesky has functional impairment from February 22, 2018, and forward. AR 1805. Similarly, Dr. Pearce opined that, based on the provided documentation and peer-to-peer discussion, from a sleep medicine perspective, functional impairment with restrictions/limitations was not supported from February 22, 2018, to the present. AR 1336.

Kopesky asserts that Aetna failed to provide Dr. Young with Kopesky's December 28, 2017 letter that described the impact of the 7.5-hour examination on his functioning over the following days. Although Aetna did not provide Dr. Young with the letter, it did submit Kopesky's letter and Dr. Young's report to Drs. Hoenig and Pearce for review, and those physicians reviewed those records in reaching their conclusions. Kopesky also argues that Dr. Hoenig and Dr. Pearce failed to consider important clinical evidence relating to his claims, including occupational, physical, and speech treatment notes from August to October 2018 as part of his appeal that he claims documented his worsening fatigue throughout the course of the day as well as medical journal articles that document studies showing fatigue as a common result of TBI. Kopesky argues that, despite Dr. Hoenig asserting that he reviewed all of the documents provided, Dr. Hoenig noted that the "last clinical note received is from Primary Care from 6/2017," AR 1805, and that Dr. Hoenig did not consider the medical journal articles. He maintains that Dr. Pearce's review was "marginally—but not substantively—better." Pl.'s Br. at 27, Dkt. No. 37. Kopesky asserts that Aetna's "willingness to endorse these opinions despite" their deficiencies was arbitrary and capricious. *Id.* at 28. Even though Dr. Hoenig did not expressly mention the treatment notes or journal articles as part of his conclusions, Dr. Pearce explicitly noted that the August to October 2018 therapy notes documented Kopesky's "difficulties multitasking, being easily distracted and mentally fatigued," AR 1335–36, and acknowledged that "[v]arious articles on sleep were also included" in the record. AR 1333. While Kopesky disagrees with the level of consideration Dr. Pearce gave these records, it is clear that Dr. Pearce did consider them in reaching his findings.

The fact that Aetna chose to accept evidence that it found more persuasive than other pieces of evidence does not compel a finding that it acted arbitrarily and capriciously. *Cf. Fischer v. Liberty Life Assur. Co. of Boston*, 576 F.3d 369, 377 (7th Cir. 2009) ("While Fischer did present

substantial evidence that his condition was organic, it was not an abuse of discretion for Liberty to reject Fischer's evidence in favor of contrary and, at least in Liberty's view, more compelling evidence."); *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007) (finding that "the Plan did not act improperly when it looked to, and credited, evidence that conflicted with the Plaintiff's treating physicians' opinion"). "[R]eaching a decision amid such conflicting evidence is a question of judgment that should be left to [the administrator] under the arbitrary-and-capricious standard." *Davis*, 444 F.3d at 578. The Court's task is "not to determine if the administrator's decision is correct, but only if it is reasonable." *Id.* at 577. Aetna's decision to rely on the findings of Dr. Young, Dr. Hoenig, and Dr. Pearce is rationally supported by the record evidence and was not arbitrary and capricious.

As to his employability, Kopesky asserts that "Aetna's sudden conclusion that Plaintiff Kopesky was already essentially performing the duties of those occupations identified in Mr. Thompson's TSA in his current endeavors at Mighty Hearts International, TecDriven, LLC, and as Owner/Contractor at B. David Construction is at odds with the evidence in the administrative file and Aetna's longstanding consideration of the impact of those activities on Plaintiff Kopesky's employability." Pl.'s Br. at 22–23 (internal quotation marks, brackets, and citation omitted). Again, Aetna is entitled to consider new information and "change its mind" in appropriate cases. *Holmstrom*, 615 F.3d at 767. In this case, Aetna relied on the findings contained in the TSA completed by vocational rehabilitation consultant Thompson to conclude that there were other reasonable occupations that Kopesky could perform, including director, owner, and president.

Kopesky argues that Aetna's consideration of Thompson's TSA was superficial and conclusory. He submitted a vocational report from Sarah Holmes in response to Aetna's initial denial. Holmes concluded that Kopesky's work experience, education, and transferrable skills did

not qualify him to work as an owner/controller; his activities for B. David Construction and TecDriven were not consistent with work performed in the general labor market and should not have been considered in the TSA; even if Kopesky could perform the occupations in the TSA, he could not command the 90th percentile of wages required to bring those occupations within the Plan's definition of "reasonable occupation;" and assuming Kopesky had no work restrictions, he would not be employable in any occupation that would compensate him at the level required by the Plan. AR 1858–64. Kopesky asserts that, despite these findings, Aetna provided conclusory reasoning for its continued reliance on Thompson's findings.

The administrator is only required to give the applicant reasons for the denial, however, and that was done in this case. *Gallow v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996) ("All [the administrator] has to give the applicant is the reason for the denial of benefits; he does not have to explain to him why it is a *good* reason."). When there is evidence presented that would seem to support the plaintiff's claim, the plan must have a reason for finding it unconvincing. If the plan administrator has not included the reasons for rejecting certain evidence in its decision, it may offer the explanation in court. *Id.* ("When challenged in court, the plan administrator can defend his interpretation with any arguments that bear upon its rationality."). In this case, Aetna concluded that Thompson's findings were more credible than Holmes' and explained why it relied on Thompson's findings.

Aetna identified Kopesky's transferrable skills and functional abilities, including those skills used in connection with his part-time endeavors. It determined that Kopesky possessed the skills necessary to work in the occupations of director, owner, and president. Aetna contends that, while Holmes dismissed these occupations because Kopesky never worked in them, Thompson properly identified occupations that Kopesky "may reasonably become" fitted to perform in

accordance with the Plan's terms. *See Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 361 (7th Cir. 2017) (holding that identification of occupations plaintiff had not performed but are ones that plaintiff "'may reasonably become' fitted by education, training, or experience" was reasonable). Although Kopesky asserts that there is no explanation why setting his wage in the 90th percentile was reasonable and actually attainable because he was out of the workforce for over fourteen years, Aetna indicated that a 90th percentile wage was the appropriate wage expectation based on Kopesky's prior education and experience. A plan administrator is entitled to choose between conflicting opinions without a detailed explanation, as long as the evidence it credits is reliable. Aetna's decision in this regard was based on rational support in the record and was not arbitrary and capricious.

Finally, Kopesky asserts that Aetna operated under a conflict of interest because Aetna both determined his LTD claim eligibility and was responsible for paying Kopesky's benefits. He argues that Aetna's conflict of interest weighs in favor of determining that its actions were arbitrary and capricious. The United States Supreme Court has held that a conflict of interest is one factor courts should consider in "determining whether the plan administrator has abused its discretion in denying benefits." *Glenn*, 554 U.S. at 108. The Court noted, however, that the "significance of the factor will depend on the circumstances of the particular case." *Id.* (citation omitted). Where an administrator takes "active steps to reduce potential bias and to promote accuracy," conflicts carry less weight. *Geiger*, 845 F.3d at 365 (citation omitted). Aetna retained independent physicians to review Kopesky's medical record and consulted a vocational case manager to identify the jobs Kopesky could perform consistent with his functional limitations. There is no evidence that Aetna's determination was influenced by a conflict of interest.

## CONCLUSION

For these reasons, the Court concludes that Aetna did not act arbitrarily and capriciously in denying Kopesky's claim for LTD benefits under the Plan. Therefore, Kopesky's motion for summary judgment (Dkt. No. 35) is **DENIED** and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 27th day of June, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge